[No. B044548. Second Dist., Div. Three. Aug. 6, 1992.]

BERNARD FRANKLIN et al., Plaintiffs, Cross-defendants and Appellants,
v.
ELIEZER APPEL, Defendant, Cross-complainant and Respondent.

## COUNSEL

Horvitz & Levy, George P. Schiavelli and Gregory R. Ellis for Plaintiffs, Cross-defendants and Appellants.

Rapkin, Gitlin, Moser & Schwartz, Michael J. Schwartz and Constantin Marcou for Defendant, Cross-complainant and Respondent.

## OPINION

**KLEIN, P. J.**—Plaintiffs, cross-defendants and appellants Bernard Franklin and Judith Franklin (the Franklins) appeal a judgment awarding $705,000 in damages to their former attorney, defendant, cross-complainant and respondent Eliezer Appel (Appel), in an action to recover attorney fees.

The central question presented is whether the Franklins may avoid their contingency fee agreement with Appel on the ground the contract lacked a statutory recital the fee was not set by law but was negotiable. (Bus. & Prof. Code, § 6147.)[1] Said statute allows a client to void an agreement which fails to comply with its requirements.

We conclude section 6147 is inapplicable because it only applies to contingency fee agreements involving *plaintiffs* in *litigation matters*, rather than to all contingency fee arrangements.[2] Accordingly, the Franklins cannot assert the lack of the prescribed recital to avoid the contract. Because the fee

---

[1] All statutory references are to the Business and Professions Code, unless otherwise specified.

[2] Rehearing was granted herein following oral argument. Thereafter, a letter issued from this court directing the litigants to provide further briefing on four specific questions: whether section 6147 applies to all contingency fee agreements or is limited to litigation matters; whether the instant agreement falls within section 6148, which applies to contracts based on hourly rates as well as "other standard rates, *fees*, and charges" and which refers to "other method[s] of determination of the attorney's fees" (§ 6148, subds. (a)(1), (b), italics added); while section 6148, which appears to relate to hourly fee arrangements, states at subdivision (a) it applies to "any case not coming with Section 6147," how can section 6148 enlarge the narrow scope of section 6147, enacted previously, which apparently relates solely to contingency arrangements in litigation matters; and, although section 6148, subdivision (a), states

agreement is not voidable, we uphold the trial court's decision which awarded Appel his full attorney fees, albeit in quantum meruit, rather than on the contract.

## ■■■ FACTUAL AND PROCEDURAL BACKGROUND[3]

### 1. *Prior representation.*

Appel had represented the Franklins in 1980-1981 in connection with their real estate and video business. Appel's representation of the Franklins in these matters ceased when he commenced action against them to collect unpaid legal fees therefor.

### 2. *Legal arrangement in issue and work performed.*

On June 3, 1983, the day set for trial in Appel's prior action against the Franklins, they agreed to pay Appel's legal fees and sought to reengage him to represent them on another matter. Although the Franklins had at least five other attorneys representing them in various legal matters, they apparently preferred to retain Appel to handle their latest financial difficulties.

Appel proposed to be retained on an hourly basis. It was the Franklins who insisted on a contingency fee arrangement. In view of their recent fee dispute, Appel drafted a comprehensive contingency fee agreement. He presented the Franklins with a draft in early July 1983, three or four weeks before the signing of the agreement. The terms of the agreement were negotiated at length. The parties executed the final 34-page contingency fee agreement on July 31, 1983.

The agreement stated Appel had advised the Franklins to seek the advice of independent counsel before entering into the agreement and that the Franklins "represent and warrant that they have done so prior to signing it." In the agreement, the Franklins "recognize the fact that the value of [Appel's] services is not necessarily a function of time invested in the rendering [*sic*] said services," and that Appel's compensation for his legal and financial consulting services would be 25 percent of the Franklins' " 'Economic profit.' " The agreement defines "Economic profit" as "[a]ny 'transaction' that results in the 'Increase' in the 'Equity' the Franklins have in each 'property or business.' "

---

that section applies to "any case not coming within Section 6147," whether certain fee arrangements, such as the instant agreement, fall outside both sections 6147 and section 6148.

The parties submitted extensive supplemental briefs complete with appendices of exhibits in response to the above questions addressing the interpretation of the sections in issue.

[3]The evidence is viewed in the light most favorable to the judgment. (*Gyerman* v. *United States Lines Co.* (1972) 7 Cal.3d 488, 492, fn. 1 [102 Cal.Rptr. 795, 498 P.2d 1043].)

Appel's services largely were concerned with two parcels of real property: a commercial building at 5419 Sunset Boulevard (the Gribbit building) and a parking lot in Hollywood (the parking lot).

Ms. Franklin had leased 6,000 square feet in the Gribbit building for her video production facility and had made approximately $200,000 in improvements to the premises.

The Franklins held a questionable 25 percent interest in Lidtke-Whorf Properties (LWP), a partnership which owned the Gribbit building. The Franklins had acquired said interest from Dennis Lidtke who had transferred it to them in violation of the LWP partnership agreement which restricted transfers by partners. Lidtke retained a 50 percent interest in LWP and Robert Weiner held the remaining 25 percent interest.

The Gribbit building had been encumbered by Lidtke, acting as managing partner, in a sum exceeding $2.7 million, with trust deeds held by four beneficiaries, including a first trust deed to Wells Fargo Bank of $1.6 million. In addition, there were tax liens and a perfected security interest in favor of Christopher Whorf of $84,000. Wells Fargo had scheduled a foreclosure sale for July 27, 1983, curable only by payment of $500,000 in cash, and neither the Franklins nor the other partners possessed the funds to cure the default.

The parking lot was owned by the Hollywood Horizon Partnership (HHP), in which the Franklins and Lidtke held interests of 49 percent and 51 percent, respectively. This property also was encumbered by four trust deeds amounting to about $930,000. Crocker Bank, the holder of the $475,000 first trust deed, had commenced foreclosure proceedings and the other encumbrances also were delinquent. Lidtke, on behalf of HHP, had signed a letter of intent with a developer to construct a 350-room hotel on the parking lot site in a $30 million project.

Summarizing Appel's efforts on behalf of the Franklins with respect to the Gribbit building, he negotiated a postponement of the foreclosure sale. Appel then obtained Lidtke's agreement to transfer full ownership of the Gribbit building to the Franklins, free and clear of the junior trust deeds. Appel persuaded the junior lienholders to accept substitute collateral as a replacement for the lienholders' tenuous interest in the building which otherwise would have been lost due to foreclosure. Appel secured a new loan from Wells Fargo, incorporating all arrearages. At that time, the bank appraised the building at $3,565,000.

As a result of Appel's efforts, on November 18, 1983, the Franklins owned 100 percent of the Gribbit building, subject only to a first trust deed to Wells

Fargo of $1,625,000, and an $82,000 second trust deed to Whorf, the latter obligation to be repaid by the Lidtkes.

As for the parking lot, Appel persuaded Lidtke to assign his interest to the Franklins to avert foreclosure, and in exchange Lidtke could retain an interest in the hotel project on the property. Thereupon, Marathon Bank refinanced the property for the Franklins.

With full ownership of the parking lot, appraised at $2.8 million and encumbered for $1 million, the Franklins had $1.8 million in equity in said property, which represented a $900,000 increase in their equity.

During the relevant time, Appel's efforts on behalf of the Franklins consumed most of his time to the exclusion of other clients.

Appel sought an advance for services rendered in order to meet his living expenses. The Franklins paid him $5,000 by a check dated August 27, 1983. Unable to advance additional funds, the Franklins also gave Appel a 12.5 percent ownership interest in the Gribbit building, representing $100,000 in earned fees. The August 27, 1983, memorandum from the Franklins to Appel stated in relevant part: "Your election to receive the above 12.5% shall not serve or be construed to supercede [sic], amend, modify or otherwise detract from any of the rights to which you are entitled to [sic] under our above referenced [fee] agreement." Pursuant to the memorandum, the Franklins executed a grant deed on September 26, 1983, which Appel subsequently recorded.

3. *Franklins' fee reduction efforts against Appel and Appel's cross-complaint.*

The Franklins engaged the law offices of Wasserman, Comden & Casselman to obtain a reduction of Appel's fees in this matter. The Franklins wanted Appel to continue providing them with legal services and simply retained the Wasserman firm to renegotiate the contingency fee agreement. Appel refused to accept any reduction in his fee.

On August 3, 1984, the Franklins filed suit against Appel for fraud, rescission, breach of contract, breach of fiduciary duty, quiet title, cancellation and setting aside of deed, and injunctive relief. Appel answered and brought a cross-complaint against the Franklins for breach of contract, fraud, quantum meruit, partition, accounting and appointment of receiver, and an injunction.

The matter was tried before the court sitting without a jury.

4. *Trial court rulings.*

a. *No recovery on the contingency fee agreement.*

The trial court rejected each of the Franklins' theories. It found insufficient evidence to support causes of action for fraud, rescission, breach of contract and injunctive relief. There was no breach of fiduciary duty because Appel's conduct and performance were not improper. The causes of action for quiet title and cancellation of instrument similarly failed. The deed was given to Appel in partial payment of his fees and not as security for fees. Appel therefore had a right to receive and record the deed.

On the cross-complaint, the trial court denied Appel's breach of contract claim. It held that because a client may terminate a contract with an attorney at will, such termination by the Franklins did not constitute a breach of contract.

The trial court went on to hold the contingency fee agreement itself was infirm because it lacked a statement " 'the fee is not set by law but is negotiable,' " and the failure to include such a statement rendered the contract voidable at the client's option pursuant to section 6147. Due to that omission, the contract was voidable "even though, . . . the contingency fee contract was a negotiated contract."

The trial court also held there was no subsequent contract entered into, there had been no modification of the original fee arrangement as set forth in the contingency fee agreement, and the $5,000 paid to Appel was an advance on his fees.

b. *Quantum meruit award approximated contingency fee.*

After holding the contingency fee agreement was voidable by the Franklins for noncompliance with section 6147, the trial court ruled Appel was entitled to recover $705,000 in quantum meruit based on the following facts: Appel fully performed the services required to complete the Gribbit building transaction before he was discharged by the Franklins. The fair market value of said property was $3,565,000. The Franklins had no equity in the Gribbit building at the time they engaged Appel. Appel's services performed in connection with the Gribbit building had a reasonable value of $485,000. The Franklins were entitled to a $5,000 credit for the fee advance to Appel. The deed given to Appel was in partial payment of his attorney fees and was equal to $100,000. The parking lot had a fair market value of $40 per square foot. Appel's services performed in connection with the parking lot had a

reasonable value of $225,000. Appel's services were fully performed in connection with the parking lot before his termination when the agreement by Lidtke to give up his interest to the Franklins was obtained.

The trial court explained the legal basis for its decision: a court may fix the reasonable value of services based on the evidence, and the court may consider the contract as an indication of what a reasonable fee might be. As for the deed to Appel, the Franklins were entitled to obtain reconveyance of Appel's 12.5 percent interest in the Gribbit building upon full payment of the judgment. Prejudgment interest was denied because a claim of quantum meruit is unliquidated and cannot be the basis for prejudgment interest.

As for attorney fees, the trial court held Appel was the prevailing party and was entitled to reasonable attorney fees under the contract in the amount of $128,170.

The trial court denied the Franklins' motion for a new trial. This appeal followed.

## CONTENTIONS

The Franklins contend: (1) they were prejudiced by the trial court's predisposition to enforce the contingency fee agreement, and the trial court de facto awarded the full measure of attorney fees provided for in the contingency fee agreement although it had been voided; (2) because the Franklins properly voided the agreement under section 6147, Appel was limited to recovering a reasonable fee for his services and the award, which equals $1,184 per hour, is excessive; (3) it was error to award Appel attorney fees pursuant to the attorney fee clause in the contingency fee agreement because the agreement was void and Appel did not prevail on the contract.

Before addressing the Franklins' contentions, it is necessary to determine whether section 6147 applies to this fact situation. To that end, as indicated, the parties filed supplemental briefs to assist the court in the resolution of this threshold issue.

## DISCUSSION

1. *Section 6147, relied on by the Franklins to avoid the contingency fee agreement, is inapplicable because it applies to contingency fee agreements involving plaintiffs in litigation matters, rather than clients generally.*

Section 6147 provides a contingency fee contract shall be in writing and shall include, inter alia, "a statement that the fee is not set by law but is

negotiable between attorney and client." (§ 6147, subd. (a)(4).) The statute further provides that failure to comply with any provision of section 6147 "renders the agreement voidable at the option of the plaintiff, and the attorney shall thereupon be entitled to collect a reasonable fee." (§ 6147, subd. (b).)[4]

As indicated, the instant contingency fee agreement did not contain a recital that *the fee was not set by law but was negotiable.* As a consequence, the trial court held the Franklins properly voided the agreement, even though, as the trial court found, "[it] was a negotiated contract."

 Appel contends a simple reading of section 6147 precludes its application to this fact situation. Appel emphasizes the statute repeatedly refers to "plaintiffs" and urges the statute contemplates plaintiffs in litigation, not clients generally, and not the kind of representation he provided the Franklins in this instance. Appel urges had the Legislature intended to govern all agreements drawn by attorneys in representing clients, it could have drafted a broader statute and eliminated the less inclusive reference to "a plaintiff."

The Franklins respond the statute applies to all contingency fee agreements, and that in light of the statute's goal of protecting clients, there is no analytical basis for distinguishing between litigation and nonlitigation clients.

---

[4]Section 6147 states: "(a) An attorney who contracts to represent a *plaintiff* on a contingency fee basis shall, at the time the contract is entered into, provide a duplicate copy of the contract, signed by both the attorney and the plaintiff, or his guardian or representative, to the *plaintiff*, . . . The contract shall be in writing and shall include. . . : [¶] (1) A statement of the contingency fee rate which the client and the attorney have agreed upon. [¶] (2) A statement as to how disbursements and costs incurred in connection with the prosecution or settlement of the claim will affect the contingency fee and the client's recovery. [¶] (3) A statement as to what extent, if any, the *plaintiff* could be required to pay any compensation to the attorney for related matters that arise out of their relationship not covered by their contingency fee contract. This may include any amounts collected for the *plaintiff* by the attorney. [¶] (4) Unless the claim is subject to the provisions of Section 6146, *a statement that the fee is not set by law but is negotiable between attorney and client.* [¶] (5) If the claim is subject to the provisions of Section 6146, a statement that the rates set forth in that section are the maximum limits for the contingency fee agreement; and that the attorney and client may negotiate a lower rate. [¶] (b) Failure to comply with any provision of this section renders the agreement voidable at the option of the *plaintiff,* and the attorney shall thereupon be entitled to collect a reasonable fee. [¶] (c) This section shall not apply to contingency fee contracts for the recovery of workers' compensation benefits." (Italics added.)

(Section 6146, enacted in 1975 as part of the Medical Injury Compensation Reform Act or MICRA, limits the contingency fee percentage in an action for injury or damage against a health care provider for professional negligence.)

a. *Alderman case not persuasive.*

*Alderman* v. *Hamilton* (1988) 205 Cal.App.3d 1033 [252 Cal.Rptr. 845], cited by both parties, is not helpful. In that case, an attorney sought to recover 25 percent of the net proceeds as his fee for services rendered in connection with the sale of certain real property. *Alderman* simply states without any analysis or discussion that "section 6147 requires *all* contingency fee agreements to be in writing" and that the statute requires full compliance with its provisions. (*Id.*, at pp. 1037, 1038, italics added.) Thus, *Alderman* concluded that even assuming the existence of an agreement to hire the attorney to perform services with respect to the property, the clients had an absolute right to void the contract for noncompliance with section 6147. (*Id.*, at pp. 1037-1038.)

Our independent research and review of the legislative history of section 6147, discussed below, leads us to conclude *Alderman*'s reading of the statute is overbroad. It would appear section 6147 applies to contingency fee agreements involving plaintiffs as clients in damages actions and does not extend to all contingency fee arrangements between attorneys and clients.

b. *Principles of statutory interpretation.*

██ "It is a settled principle in California law that 'When statutory language is . . . clear and unambiguous there is no need for construction, and courts should not indulge in it.' [Citation.]" (*In re Waters of Long Valley Creek Stream System* (1979) 25 Cal.3d 339, 348 [158 Cal.Rptr. 350, 599 P.2d 656].) The function of the court is simply to ascertain the meaning of the statute from its inherent terms or substance and not to insert what has been omitted or omit what has been inserted. (*Estate of Tkachuk* (1977) 73 Cal.App.3d 14, 18 [139 Cal.Rptr. 55].) The court will not, under the guise of construction, rewrite a law, and will not give the words an effect different from the plain and direct import of the terms used. (*Ibid.*) The literal meaning of the words of a statute may be disregarded, however, to avoid absurd results or to give effect to manifest purposes that, in light of the statute's legislative history, appear from its provisions considered as a whole. (*County of Sacramento* v. *Hickman* (1967) 66 Cal.2d 841, 849, fn. 6 [59 Cal.Rptr. 609, 428 P.2d 593].)

c. *Overview.*

Section 6147 had its origins in a proposed amendment to section 6146, which already had limited contingency fees in medical malpractice actions.

As introduced, Assembly Bill No. 490 would have deleted the references in section 6146 to "health care provider[s]" and would have expanded section 6146 to limit contingent fees in "any action for injury or damages against any person based upon that person's negligence." (Legis. Counsel's Dig., Assem. Bill No. 490, introduced Feb. 12, 1981 (1981-1982 Reg. Sess.), original italics deleted; see *Yates* v. *Law Offices of Samuel Shore* (1991) 229 Cal.App.3d 583, 592 [280 Cal.Rptr. 316].)

Assembly Bill No. 490 subsequently was amended to add a new section, section 6147, to the Business and Professions Code, leaving section 6146 unchanged. Assembly Bill No. 490, as amended January 25, 1982, no longer sought to impose a ceiling on contingency fees in nonmedical malpractice actions. Instead, it required "an attorney who contracts to represent a plaintiff on a contingency fee basis to provide a copy of the contract to the client and to include in the contract a statement disclosing the contingency fee rate, a statement as to how disbursements and costs will affect the fee and the client's recovery, and certain other disclosure statements." (See Legis. Counsel's Dig., Assem. Bill No. 490 (1981-1982 Reg. Sess.) amended Jan. 25, 1982.)

Following some further amendments, not pertinent here, the bill became law. (Stats. 1982, ch. 415, § 2, p. 1761.)

Thus, the Legislature elected not to extend section 6146's limitations on contingency fees to the prosecution or settlement of claims outside the medical malpractice context. Rather, it chose to protect clients by requiring the inclusion of a recital that such fees are negotiable. To that end, it enacted section 6147 to regulate the form and content of contingency fee contracts in both medical malpractice cases and other cases.

d. *Legislative history does not support the Franklins' broad interpretation of section 6147.*

While recognizing Assembly Bill No. 490 originally was drafted to broaden the scope of section 6146 beyond medical malpractice actions to *all negligence actions*, the Franklins contend the bill, as adopted, was intended to protect *all* clients, not just litigation plaintiffs.

To support their broad interpretation of section 6147, the Franklins rely, inter alia, on two letters sent to the Governor regarding Assembly Bill No. 490.[5, 6]

■ However, letters setting forth the motives of individual legislators are not admissible on the issue of legislative intent. (See *California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699-700 [170 Cal.Rptr. 817, 621 P.2d 856].) ■ In any event, the Franklins' reliance on these two documents is misplaced. Both letters appear to have been written to eliminate the confusion caused by an earlier letter from the Honorables Nolan and Sieroty which asserted Assembly Bill No. 490 was intended, inter alia, "to promote settlement in cases."

Neither of the two letters cited by the Franklins speaks to the issue before us, namely, whether the Legislature intended in section 6147 to regulate *all* contingency fee arrangements or merely the form and content of contingency fee agreements involving plaintiffs in damages actions.

The Franklins also urge that because section 6147 is a remedial statute, it should be construed broadly to apply to clients generally, so as to protect the persons within its purview and to advance its clear purpose. (See *Tammen* v. *County of San Diego* (1967) 66 Cal.2d 468, 480 [58 Cal.Rptr. 249, 426 P.2d 753]; *Fitch* v. *Pacific Fid. Life Ins. Co.* (1975) 54 Cal.App.3d 140, 148 [126 Cal.Rptr. 445].) However, there is nothing in the legislative materials to show the Legislature was concerned with anything other than protecting clients who are plaintiffs in civil actions and who enter into contingency fee arrangements with counsel.

Further, the mere fact section 6147 in several places uses the term client does not support a broad interpretation of the statute. Section 6147 unambiguously begins by stating "[a]n attorney who contracts to represent a

---

[5] We take judicial notice of various legislative materials dealing with the adoption of section 6147. (Evid. Code, §§ 452, subd. (c), 459; see *Commodore Home Systems, Inc.* v. *Superior Court* (1982) 32 Cal.3d 211, 218, fn. 9 [185 Cal.Rptr. 270, 649 P.2d 912].)

[6] One of the letters cited by the Franklins, written by Honorable Elihu M. Harris, Chairman of the Assembly Committee on Judiciary, and Assembly Member Patrick Nolan, one of the bill's coauthors, states, inter alia: "The intent of the Assembly Judiciary Committee in passing [Assembly Bill No.] 490 was to provide *clients* with disclosure of the contents of contingency fee arrangements that they enter into with their attorneys. No other inference should be drawn from Judiciary Committee approval of [Assembly Bill No.] 490." (Italics added.)

The second letter, by State Senator Alan Sieroty, coauthor of Assembly Bill No. 490, states: "This letter is meant to clarify the record as to my intent in co-authoring and supporting [Assembly Bill No.] 490 . . . . [¶] My intent in supporting [Assembly Bill No.] 490 was solely to provide *clients* with a clear understanding of contingency fee arrangements that they enter into with their attorneys. No other inference should be drawn from my support of [Assembly Bill No.] 490." (Italics added.)

*plaintiff* on a contingency fee basis shall, . . ." (Italics added.) When section 6147 subsequently uses the term client, it simply utilizes that term as a synonym for plaintiff. No larger significance should be inferred from the use of the term client in the section as presently drawn.

(1) *We decline the Franklins' invitation to rewrite section 6147.*

The Franklins ask this court, rather than the Legislature, to alter the language of section 6147 by construing the word plaintiff to mean *any* client, allegedly to better effectuate the Legislature's intent. They argue there is no discernible reason for the Legislature to have protected plaintiffs in litigation and not clients in other situations.

Contrary to the Franklins' argument, ample grounds exist to distinguish between litigation plaintiffs and other clients. In considering section 6147, the Legislature was concerned with the issue of excessive contingency fees being received by plaintiffs' attorneys. As argued by Appel, the Legislature was aware such plaintiffs may lack sophistication in legal matters, noting "[i]ndividuals involved in lawsuits where contingency fees are to be charged generally are unfamiliar with the nature or mechanics of legal representation." (Assem. Off. of Research, 3d Reading Analysis, Assem. Bill No. 490, amended Jan. 25, 1982.) Thus, in adopting section 6147 to regulate the contents of contingency fee agreements, the Legislature reasonably could choose to protect only those clients whom it viewed as most in need of protection.

With that concern in mind, Assembly Bill No. 490, which began as an amendment to section 6146, was aimed at limiting attorney contingency fees in all actions based on negligence. The bill's proponents sought to " 'prevent unjust enrichment of certain members of the legal profession merely because the client has suffered great damage.' " (Assem. Com. on Judiciary, Rep. on Assem. Bill No. 490, Jan. 20, 1982, Staff Comments.) Ultimately, instead of extending the *limits* on contingency fees to all negligence actions, the Legislature chose to regulate the *form* of contingency fee agreements by requiring attorneys who represent *plaintiffs* on a contingency fee basis to provide the client with a copy of the contract and to include certain disclosure statements. However, the legislative history does not indicate the Legislature broadened its initial focus from plaintiffs in litigation to clients generally.

e. *Appel's propounded legislative interpretation more persuasive.*

Appel's effort at proper interpretation of section 6147 begins with the perceived original goal of the Legislature in its enactment, which was to

extend the medical malpractice attorney *fee limitation* of section 6146 to *all negligence actions*. Appel cites the strong opposition from the State Bar and the California Trial Lawyers Association, and the expressed impact a fee limitation would have on the accessibility of the legal system to the poor. Therefore, the Legislature deleted the fee limitation in favor of a *disclosure* requirement in a newly created section 6147 to protect unsophisticated litigants.

Appel cites *California Assn. of Psychology Providers* v. *Rank* (1990) 51 Cal.3d 1, 17 [270 Cal.Rptr. 796, 793 P.2d 2], for the court's proper reliance on the Legislative Counsel for the court's interpretation of a statute. ■ The interpretation of the legislation provided by the Legislative Counsel is entitled to " 'great weight,' " particularly in view of the Legislative Counsel's role in "assist[ing] the Legislature in its consideration of pending legislation." (*Ibid.*)

■ Here, the Legislative Counsel specifically pointed out section 6147 was directed at *plaintiffs*, stating: "This bill would require an attorney who contracts to represent a *plaintiff* on a contingency fee basis to provide a copy of the contract to the client and to include in the contract a statement disclosing the contingency fee rate, . . ." (Legis. Counsel's Dig., Assem. Bill No. 490 (1981-1982 Reg. Sess.) as amended Jan. 25, 1982, italics added.)

Similarly, the Assembly Third Reading analysis reflects that Assembly Bill No. 490 was aimed at "an attorney who agrees to represent a *plaintiff* on a contingency fee basis involving any type of *legal complaint*, . . ." (Assem. Off. of Research, 3d Reading Analysis, Assem. Bill No. 490, amended Jan. 25, 1982, italics added.) Thus, Assembly Bill No. 490 relates to *litigation* services by attorneys, not to legal representation generally.

 f. *This court's additional observations.*

We make our own observation that the term plaintiff is a term of art in the law meaning "the party complaining" in a civil action. (Code Civ. Proc., § 308.) Further, we cannot believe the Legislative Counsel failed to appreciate the significant difference among the terms plaintiff, person and client in carrying out its role of analyzing this legislation for the Legislature.

Nor can we assume the Legislature overlooked the difference among these various terms. In considering Assembly Bill No. 490, the Legislature ultimately deleted the reference in the bill to negligence actions, choosing instead to extend the bill to civil actions generally, but, presumably with

appreciation of its import, left the term plaintiff in the final version of section 6147.

In sum, because the literal application of section 6147 to plaintiffs in litigation does not result in an absurdity and does not contravene the purpose of the statute, we reject the Franklins' argument the statute should be construed broadly to apply to *all* clients and not merely to clients who are plaintiffs in damages actions.[7]

Should the Legislature intend section 6147 to apply to all contingency fee arrangements between attorneys and *clients generally*, irrespective of whether the representation contemplates litigation or transactional matters, a simple amendment to that effect will suffice; client or person may be substituted for plaintiff.

g. *Subsequent adoption of section 6148 does not alter our interpretation of the limited scope of section 6147.*

■ Section 6148, which governs *hourly* fee arrangements, was adopted in 1986, some four years after section 6147 was enacted and *after* the parties entered into the instant agreement. Section 6148, at subdivision (a), proclaims it applies to "any case not coming within Section 6147."[8] However, the adoption of section 6148 to regulate hourly fee agreements does not mean that all contingency fee agreements necessarily fall within section 6147.

---

[7] It is unnecessary to examine the applicability of section 6147 to cases in which a plaintiff is suing for equitable relief rather than damages where there is no recovery upon which to base a percentage fee.

[8] Section 6148 states: "(a) In any case not coming within Section 6147 in which it is reasonably foreseeable that total expense to a client, including attorney fees will exceed one thousand dollars ($1,000), the contract for services . . . shall be in writing and shall contain all of the following: [¶] (1) The hourly rate and other standard rates, fees, and charges applicable to the case. [¶] (2) The general nature of the legal services to be provided to the client. [¶] (3) The respective responsibilities of the attorney and the client as to the performance of the contract. (b) All bills for services rendered by an attorney to a client shall clearly state the basis thereof. Bills for the fee portion of the bill shall include the amount, rate, basis for calculation, or other method of determination of the attorney's fees and costs. . . . [¶] (c) Failure to comply with any provision of this section renders the agreement voidable at the option of the client, and the attorney shall, upon the agreement being voided, be entitled to collect a reasonable fee. [¶] (d) This section shall not apply to any of the following: [¶] (1) Services rendered in an emergency to avoid foreseeable prejudice to the rights or interests of the client or where a writing is otherwise impractical. [¶] (2) An arrangement as to the fee implied by the fact that the attorney's services are of the same general kind as previously rendered to and paid for by the client. [¶] (3) If the client knowingly states in writing, after full disclosure of this section, that a writing concerning fees is not required. [¶] (4) If the client is a corporation. [¶] (e) This section applies prospectively only to fee agreements following its operative date."

With the enactment of section 6148, stating it applies to "any case not coming within Section 6147," it would appear the Legislature believed it had now covered the entire field of attorney/client fee arrangements. However, the Legislature's efforts in this regard have fallen short of the mark. The large gap in section 6147 cannot be cured by the subsequently enacted broad language of section 6148. The adoption of section 6148 did not operate as an implicit revision of section 6147, which remained unamended. Section 6147, as adopted in 1982, unambiguously applies only to the subcategory of clients who are plaintiffs in litigation. The subsequent enactment of section 6148 in 1986 could not vest section 6147 with a meaning it clearly lacks.

In adopting sections 6147 and 6148 in their present form, the Legislature failed to contemplate the wide variety of possible fee arrangements between attorneys and clients, such as contingency fee agreements outside the litigation context. While a reexamination of the statutory scheme may be in order, any expansion of the reach of section 6147 is a matter for the Legislature, not for the courts.

### h. *Instant agreement falls outside section 6147.*

■ The Franklins are not within the class which the Legislature sought to protect by enacting section 6147. The Franklins did not retain Appel to represent them in litigation. In fact, the contract specifically excluded litigation services, for which eventuality the Franklins agreed to hire independent counsel at Appel's direction.[9]

We make the further observation that because this was not a litigation matter, there would be no recovery following settlement or judgment upon which to base a standard contingent fee. Therefore, the parties had no alternative but to negotiate Appel's compensation for his services and that is precisely what they did.[10]

In sum, because the instant agreement is not governed by section 6147, the Franklins cannot invoke the lack of a recital in the agreement regarding the negotiability of Appel's fee as a defense to avoid the contract.

[9]The agreement provided in relevant part: "[T]he services to be performed by [Appel] . . . shall not include Litigation, Bankruptcy matters or other specialty areas for which the Franklins agree to hire independent counsel at [Appel's] direction . . . and pay such counsel for such services[.]"

[10]The record reflects this contract followed weeks of negotiations between the parties. Based thereon, it would appear the Franklins were well aware of their right to a negotiated fee. Thus, the trial court found the contingency fee contract had been negotiated, even though the contract did not recite that Appel's fee was negotiable.

## 2. *Trial court's error in basis for award nonprejudicial.*

██ Because section 6147 is inapplicable to the instant contingency fee agreement, the trial court erred in holding the Franklins were entitled to void the agreement pursuant to section 6147 and in resorting to a quantum meruit measure of damages. Instead, the trial court should have rejected the Franklins' reliance on section 6147, upheld the agreement, and awarded damages to Appel pursuant to the agreement. However, the trial court's error in allowing the Franklins to void the agreement clearly was nonprejudicial because its award to Appel in quantum meruit, following trial, approximates Appel's earned fee pursuant to the agreement.

Notwithstanding the trial court's resort to a quantum meruit measure of damages, it appears the trial court fully compensated Appel for his excellent results and that it awarded Appel the entire fee to which he was entitled pursuant to the contract. ██ Indeed, in contending the trial court overvalued Appel's services in quantum meruit, the Franklins complain the $705,000 award gives Appel "the exact amount provided for under the contingency agreement."[11] Further, Appel evidently is not aggrieved by the size of the award as he did not cross-appeal. We can only conclude the judgment represents the full amount Appel earned under the valid fee agreement. ██ It is settled a correct decision will not be disturbed on appeal merely because given for a wrong reason, as the appellate court reviews the action of the lower court and not the reasons for its action. (*D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 19 [112 Cal.Rptr. 786, 520 P.2d 10]; 9 Witkin, Cal. Procedure, *supra*, § 259, p. 266.)

██ Accordingly, the trial court's arrival at a damage award of $705,000, although pursuant to an incorrect theory, must be sustained.

### a. *No merit to Franklins' contention that Appel is limited to quantum meruit recovery for his services.*

██ *Fracasse* v. *Brent* (1972) 6 Cal.3d 784 [100 Cal.Rptr. 385, 494 P.2d 9], cited by the Franklins, is inapposite. That case recognized the attorney/client relationship is terminable by the client at will and the discharged attorney is limited to quantum meruit recovery for the reasonable value of the services rendered up to the time of discharge. (*Id.*, at pp. 790-791; see Code Civ. Proc., § 284.)

---

[11]While briefs and argument are outside the record, they are reliable indications of a party's position on the facts as well as the law, and a reviewing court may make use of statements therein as admissions against the party. (*DeRose* v. *Carswell* (1987) 196 Cal.App.3d 1011, 1019 [242 Cal.Rptr. 368]; *Mangini* v. *Aerojet-General Corp.* (1991) 230 Cal.App.3d 1125, 1152 [281 Cal.Rptr. 827]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 251, p. 258.)

Here, the Franklins terminated Appel *after* he had performed fully with respect to both properties. They fired Appel shortly after close of escrow on the Gribbit building. Further, with respect to the parking lot, the trial court found Appel's services "were fully performed in connection with [that property] before his termination [by the Franklins] when the agreement by Mr. [Lidtke] to give up his interest to [the Franklins] was obtained." The Franklins do not attack that finding.

Accordingly, the Franklins' belated discharge of Appel did not entitle them to avoid their contractual obligation to compensate Appel pursuant to the contingency fee agreement they had negotiated.

### 3. *Remaining contentions unavailing.*

The Franklins contend at length the trial court was predisposed to enforce the contingency fee agreement, that it refused to apply the legal standards applicable to the determination of a reasonable attorney fee in quantum meruit, and that it de facto revived the voided contingency fee agreement. The arguments fail because the fee agreement is a valid contract and is not voidable under section 6147. Thus, the trial court's large damage award properly effectuated the agreement, albeit for the wrong reason.

There is no merit to the Franklins' contention the trial court abused its discretion and overestimated the reasonable value of Appel's services in quantum meruit. Because the contract was not voidable by the Franklins under section 6147, Appel was entitled to recover the full amount of his fees pursuant to the contract rather than in quantum meruit. As recognized by the Franklins, Appel's earned fees *under the contract* amounted to $710,000 (of which the Franklins had merely paid him $5,000). Thus, the trial court simply should have enforced the contract directly rather than indirectly by way of quantum meruit.

Nor is there any merit to the Franklins' claim the memorandum of August 27, 1983 resulted in a modification of the fee agreement to a fixed $100,000 fee. The instrument plainly states Appel's election to receive a $100,000 interest in the Gribbit building did not modify or detract from any of his rights under the fee agreement.

Because Appel was entitled to his earned fees pursuant to the contract, it is unnecessary to address the Franklins' argument that the fee arrangement relating to the Gribbit building required evidence extrinsic to the contract and hence could not be considered in determining the reasonable value of Appel's work on that property.

■ Lastly, the Franklins seek a reversal of the $128,170 attorney fee award to Appel as the prevailing party at trial. They do not challenge the *amount* of the award but contend the trial court erred in enforcing the attorney fee provision in the voided agreement and in declaring Appel the prevailing party on the contract. Because the trial court should have upheld the contingency fee agreement as a valid contract between the parties, and the agreement contained an attorney fee provision, Appel was entitled to recover his reasonable attorney fees as the party prevailing on the contract, pursuant to the attorney fee clause in the agreement.

## DISPOSITION

The judgment is affirmed. Appel to recover reasonable attorney fees and costs on appeal pursuant to the contract.

Croskey, J., and Hinz, J., concurred.